ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE
————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————

No. 22-3088
————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

JESUS D. RIVERA,                             Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BARRY KENT DISNEY
\* DAVID B. GOODHAND, DC Bar 438844
Assistant United States Attorneys
\* Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
Cr. No. 1:21-cr-60 (CKK)    (202) 252-6829

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), appellee states as follows:

## Parties and Amici

The parties to this appeal are appellant, Jesus D. Rivera, and appellee, the United States of America.

## Rulings Under Review

Rivera challenges the sufficiency of the evidence supporting three of his convictions and contends his eight-month sentence is unreasonable. The district court's denial of Rivera's motion for judgment of acquittal is reported at *United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022).

## Related Cases

Rivera previously appealed the denial of his motion for release pending appeal, which this Court affirmed in an unpublished order. *See United States v. Jesus D. Rivera*, No. 22-3088, 2023 WL 1484683 (D.C. Cir. Jan. 30, 2023).

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are reproduced in the addendum of this brief.

# TABLE OF CONTENTS

COUNTERSTATEMENT OF THE CASE............................................. 1

   Background........................................................................2

      The Government's Case .................................................2

      Rivera's Sentencing ....................................................9

SUMMARY OF ARGUMENT ........................................................13

ARGUMENT .........................................................................14

   I.  Sufficient Evidence Supported Rivera's Disorderly Conduct and Parading Convictions. ...................................................... 14

      A.  Applicable Legal Principles and Standard of Review ........ 15

      B.  Rivera Engaged in Disorderly or Disruptive Conduct with the Intent To Impede the Electoral College Certification. ...................................................... 17

   II.  The District Court's Within-Guidelines Sentence Is Procedurally Correct and Substantively Reasonable. ..............21

      A.  Applicable Legal Principles and Standard of Review ........21

      B.  In Carefully Applying the § 3353(a) Factors, Considering the Parties' Arguments, and Assiduously Explaining Its Reasoning, the District Court Arrived at a Procedurally Sound and Substantively Reasonable Eight-Month Sentence. ......................................................22

CONCLUSION ................................................................29

# TABLE OF AUTHORITIES*

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ......................................... 21, 22

*Thorne v. United States*, 46 A.3d 1085 (D.C. 2012) ................................ 26

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021),
 *cert. denied*, 142 S. Ct. 1350 (2022) .................................................. 5, 20

\* *United States v. Bell*, 905 F.2d 458 (D.C. Cir. 1990) ............................. 25

*United States v. Boyd*, 803 F.3d 690 (D.C. Cir. 2015) ............................ 16

*United States v. Cano-Flores*, 796 F.3d 83 (D.C. Cir. 2015) ................... 25

*United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999) ........................... 17

*United States v. Jones*, 997 F.2d 1475 (D.C. Cir. 1993) (en banc) .......... 24

*United States v. Lemon*, 723 F.2d 922 (D.C. Cir. 1983) .......................... 25

*United States v. Miller*, 890 F.3d 317 (D.C. Cir. 2018) ..................... 21, 22

*United States v. Parks*, 995 F.3d 241 (D.C. Cir. 2021) ..................... 22, 27

*United States v. Reynoso*, 38 F.4th 1083 (D.C. Cir. 2022) ...................... 16

*United States v. Rivera,* 607 F. Supp. 3d 1 *(*D.D.C. 2022*)* ................. 9, 19

---

\* Authorities upon which we chiefly rely are marked with asterisks.

## Statutes and Rules

18 U.S.C. § 1752(a)(1)...................................................................... 1, 15

18 U.S.C. § 1752(a)(2)................................................................. 1, 10, 15

18 U.S.C. § 1752(b)(2)........................................................................27

18 U.S.C. § 3553 ...............................................................................23

18 U.S.C. § 3553(a) ...........................................................................27

18 U.S.C. § 3553(a)(1)............................................................ 11, 12, 23

18 U.S.C. § 3553 (a)(2)(A)................................................................23

18 U.S.C. § 3553(a)(2)(B)............................................................12, 23

18 U.S.C. § 3553(a)(6)....................................................................10, 13

40 U.S.C. § 5104(e)(2)(D)....................................................... 1, 15, 27

40 U.S.C. § 5104(G) ..........................................................................27

40 U.S.C. § 5104(e)(2)(G)................................................................2, 16

40 U.S.C. § 5109(b)(2)........................................................................27

U.S.S.G. § 2A2.4(a) ............................................................................9

Fed. R. App. P. 30(a)..........................................................................2

Fed. R. Evid. 801(d)(2)........................................................................6

# ISSUES PRESENTED

I. Whether sufficient evidence supported Rivera's convictions for Disorderly Conduct in a Restricted Building; Disorderly Conduct in a Capitol Building; and Parading, Demonstrating, or Picketing in a Capitol Building?

II. Whether Rivera's eight-month, within-Guidelines sentence is procedurally correct and substantively reasonable?

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 22-3088

———————————————

UNITED STATES OF AMERICA,                                Appellee,

v.

JESUS D. RIVERA,                                Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

BRIEF FOR APPELLEE

———————————————

## COUNTERSTATEMENT OF THE CASE

After participating in the January 6, 2021, attack on the United

States Capitol, appellant, Jesus D. Rivera, was charged by criminal

information with four counts: Entering and Remaining in a Restricted

Building (Count 1), in violation of 18 U.S.C. § 1752(a)(1); Disorderly and

Disruptive Conduct in a Restricted Building (Count 2), in violation of 18

U.S.C. § 1752(a)(2); Violent Entry and Disorderly Conduct in a Capitol

Building (Count 3), in violation of 40 U.S.C. § 5104(e)(2)(D); and

Parading, Demonstrating, or Picketing in a Capitol Building (Count 4), in violation of 40 U.S.C. § 5104(e)(2)(G) (ECF #39).[1] Following a bench trial, the district court (the Honorable Colleen Kollar-Kotelly) found Rivera guilty on all four counts (see ECF #82). On November 3, 2022, Judge Kollar-Kotelly sentenced Rivera to eight months' imprisonment on Counts 1 and 2 and six months' imprisonment on Counts 3 and 4, all sentences to run concurrently (*id.*). Rivera timely appealed on November 8, 2022 (ECF #79).

# Background

## *The Government's Case*

Following the 2020 presidential election, on January 6, 2021, Vice-President Mike Pence travelled to the United States Capitol for certification of the Electoral College votes (6/14/22:29-30). The United States Capitol Police and the Secret Service established a security perimeter around the Capitol to ensure Vice-President Pence's safety (6/14/22:30-32, 56-62; see Exh. 100 (depicting perimeter)). "[O]nly

---

[1] In contravention of Fed. R. App. P. 30(a), Rivera has not filed an Appendix. Accordingly, our citations are to the electronic docket filings (ECF) and the relevant transcripts.

authorized personnel" could enter the perimeter, which the Capitol Police and Secret Service marked off with mesh fencing, bike racks, and restricted-area signs (6/14/22:32, 61-62). Further, numerous Capitol Police officers manned this security perimeter on January 6 (6/14/22:66).

In addition to this security perimeter, the United States Capitol was closed to the public on January 6, 2021 (6/14/22:52). Only Members of Congress, authorized staff with business inside the building, and other persons conducting official business could enter the Capitol (6/14/22:52-53). And, except for Members of Congress, all persons entering the Capitol on January 6 had to present identification, pass through a magnetometer, and have their effects screened by an x-ray machine (6/14/22:52-53).[2] These procedures were necessary to ensure that "no contraband g[ot] in, no type of weapons, or anything that could harm anybody in the building" (6/14/22:54).

---

[2] Similarly, only credentialed members of the media who had previously been "vetted" by either the Senate or House media gallery could enter the Capitol on January 6 (6/14/22:54-55). And, like all other congressional staff, such media members had to show identification and be screened (6/14/22:54-55).

Though the Capitol grounds and Capitol were off-limits to unauthorized persons on January 6, hundreds of rioters – including Rivera – violently breached both the Capitol-grounds security perimeter and the Capitol building (6/14/22:77-78, 84-85). The rioters overwhelmed the Capitol Police's security measures by, among other things, "knock[ing] down" officers, "trampl[ing]" them, and "hit[ting]" them with "various objects" (6/14/22:88). The rioters also deployed "[c]hemical[ ]" sprays (6/14/22:88). Despite their courageous efforts to repel the violent mob, the Capitol Police officers were "overrun" and the rioters breached several Capitol entrances (6/14/22:40; see Exh. 300 (time-lapsed video depicting breaches); Exh. 336 (chart summarizing sequential breaches of restricted areas, including Peace Circle (at 12:54 p.m.), Capitol's Upper Terrace (at 2:09 p.m.), Senate Wing Door (at 2:13 p.m.), and Parliamentarian's Door (at 2:42 p.m.))).

The myriad Capitol breaches forced the Senate and House to cease their certification work at 2:13 p.m. and 2:29 p.m., respectively (6/14/22:44; Exh. 301 (time-stamped video chronicling disruptions to congressional business)). Further, as a consequence of this "large group" getting "way too close" to Vice-President Pence, the Secret Service

4

activated its emergency action plan at 2:25 p.m. and moved the Vice-President and his family to "a more secure location" in the Capitol (6/14/22:40-43; Exh. 327).[3] The Senate and House did not thereafter reconvene until 8:06 p.m. and 9:02 p.m., respectively (Exh. 301). During these multi-hour recesses, law-enforcement authorities "render[ed] [the Capitol] safe" by removing all unauthorized persons and "sweep[ing]" for "dangerous materials or objects" (6/14/22:45).

Rivera documented his participation in the Capitol riot in real time by livestreaming certain videos he took using his cellphone and camera.[4] After attending a noontime "Stop the Steal" rally at the Ellipse,[5] Rivera

---

[3] Vice-President Pence remained in this secure location for "several hours," until "sometime between 7 and 8" p.m. (6/14/22:43).

[4] Law enforcement authorities executed a search warrant at Rivera's Florida home in late-January 2021 and seized, among other things, his phone, his camera, and the distinctive red-and-black fleece jacket he wore on January 6 (6/14/22:97-101; see Exh. 1 (digital evidence from Rivera's phone); Exh. 4 (Rivera's camera); Exh. 9 (Rivera's fleece); Exh. 11 (Rivera's phone); Exh. 12 (SD card from Rivera's camera)). At the start of Rivera's trial, the district court admitted these items, including the videos recovered from Rivera's electronic devices (6/14/22:5-6).

[5] "In anticipation" of Congress's certification of the Electoral College vote, President Donald Trump held a rally of his supporters on the Ellipse, just south of the White House. *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022).

thus chronicled his movement from Constitution Avenue – where he proclaimed he was "about to take [his] ass to the middle of the State [sic] Capitol" – to the  Capitol Crypt, which is directly below the Rotunda (6/14/22:107, 112-50; Exhs. 305, 326). Specifically, after leaving Constitution Avenue and breaching the Capitol-grounds security perimeter,[6] at approximately 2:00 p.m. Rivera traversed the Capitol's West Lawn, walked to the steps leading to the Capitol's Upper Terrace, and filmed a mass of rioters violently trying to breach a police line (6/14/22:113-28; Exhs. 306-08 (videos); Exh. 337 (chart detailing Rivera's progression)). "[I]t was clear that the police officers were trying to keep people off the stairs, and that was a clear line of demarcation that they had set to keep people from progressing past that point" (6/14/22:126;

---

[6] Rivera undoubtedly knew the Capitol grounds were a restricted area on January 6. One of his videos depicted the "ripped down" security fencing that he passed as he walked onto the Capitol's West Lawn and, indeed, captured an unknown man remarking, "We're not supposed to be up here. It's all blocked off." (6/14/22:113-15; Exh. 306.) Further, in a live Facebook video created the day after the riot as Rivera and his wife traveled back to Florida, Rivera's wife conceded that, by the time she and Rivera reached the Capitol grounds, "all the barriers ha[d] been broken, the mesh fences, the metal barriers" (Exh. 403 (timestamp: 7:30-7:37); see 6/14/22:168-69 (admitting statement pursuant to Fed. R. Evid. 801(d)(2) as one Rivera manifested he "adopted or believed to be true")).

Exh. 308).[7] While filming this pitched battle, Rivera proclaimed to his livestream audience, "Patriots are going crazy. . . . Let's get out there." (Exh. 310.)

At 2:09 p.m., the rioters broke through the police line and flooded the Capitol's Upper Terrace (6/14/22:123; Exh. 337). Though Rivera predicted "it was going to get bad," he followed the mob, reaching the Capitol's Upper Terrace a few minutes later (at 2:23 p.m.) (6/14/22:132-34; Exhs. 310, 312-13, 337). On the Upper Terrace, Rivera filmed rioters breaching the Senate Wing and Parliamentarian Doors and breaking the adjacent windows (6/14/22:139-40; Exh. 317). While filming this destruction, Rivera remarked, "This is what me and my boy were talking about. We were saying the only way this would be a real revolution is if we go in and pull their asses out." (6/14/22:140; Exh. 317.) Rivera also gleefully exulted that, although his actual birthday was three days later,

---

[7] At the base of the Upper Terrace stairs, Rivera announced the police were "shooting pepper spray and stuff" and, after turning the camera on himself, recorded the adjustments he thus made to his hat and mask (Exh. 310). Additionally, Rivera remarked, "let's see if all that time in the OC chamber helps," which is a device "typically used as part of military training to help indoctrinate military members to the effects of tear gas, OC spray" (6/14/22:131; Exh. 310).

"today's my fucking birthday" and proudly declared the Capitol attack was "[s]omething we can tell our kids about" (6/14/22:140-42; Exhs. 317, 334).

At 2:59 p.m., while still filming, Rivera then entered the Capitol through a broken window next to the Senate Wing Door (6/14/22:142-43; Exhs. 320, 321, 337).[8] Once inside, Rivera moved to the Capitol Crypt, where rioters chanted, "Whose House? Our House!" (6/14/22:148; Exh. 328.) After approximately 20 minutes inside the Capitol, Rivera left the building at 3:21 p.m. by climbing through another broken window adjacent the Senate Wing Door (6/14/22:148-50; Exhs. 329, 337).

In a Facebook post later the same day, Rivera declared, "I can honestly say I had a great time" (6/14/22:154-55; Exh. 400). Further, in a video posted three days after the attack, Rivera admitted that he had participated in the "D.C. riot" by, among other things, "push[ing]" his "way through the riot police":

> [O]ne of the times I did challenge authority was very recently during the D.C. riot. I was inside the Capitol Building and

---

[8] Rivera's video captured the Capitol's "alarm going off in the background," which is a "[v]ery loud" alarm directing Members and their staff to lock themselves in their offices (6/14/22:142-43; *id.* at 88; Exh. 321).

being one of the people who, unfortunately, pushed their way through the riot police. (6/14/22:151-52; Exh. 331.)

At the end of Rivera's bench trial, the district court found him guilty of all four charges, concluding the "evidence show[ed] beyond a reasonable doubt that Jesus Rivera was no mere passive observer on January 6, 2021." *Rivera*, 607 F. Supp. 3d at 11. Rather, Rivera "took a side, and it was the side of the insurrection." *Id.*

### *Rivera's Sentencing*

Based on an adjusted total offense level of 10 and a Criminal History category of I,[9] the Probation Office calculated Rivera's Sentencing Guidelines range as six to twelve months' imprisonment (ECF #74 at ¶¶ 40, 46-47, 84; see 11/3/22:3-4). In its sentencing memorandum, the United States advocated for a nine-month sentence, noting Rivera was "a jubilant participant" in the Capitol attack and, in the "days, weeks, and months after January 6, with time for sober reflection on what he had done, Rivera had no remorse" (ECF #69 at 1, 17). After the attack, Rivera told a friend he had had a "great time,"

---

[9] Rivera's base offense level was 10 and he received no acceptance-of-responsibility or role-in-the-offense adjustments (ECF #74 at ¶¶ 28-43). *See* U.S.S.G. § 2A2.4(a).

informed those who disagreed with him that they were "weak as fuck," and, most egregiously, in March 2021, "publicly mocked the suffering of Capitol Police Officers" (*id.* at 17-18). Specifically, after Officers Aquilino Gonell and Harry Dunn testified before Congress about how they and other officers were "'punched, pushed, kicked, shoved, [and] sprayed with chemical irritants,'" Rivera posted photographs of the crying officers on his Instagram account with a "'tag line' suggesting that the officers had been frightened by a man dressed as a bear, yelling [FREEDOM]" (*id.* at 8-10).[10]

---

[10] The United States also attached a 34-page table to its sentencing memorandum, which documented the "sentences imposed on other Capitol breach defendants" and showed that a nine-month sentence would "not result in unwarranted sentencing disparities" (ECF #69 at 20 n.7; ECF #73-1 (table)). *See* 18 U.S.C. § 3553(a)(6). The United States highlighted several comparable cases, including *United States v. Simon*, No. 1:21-cr-346 (BAH) (ECF #69 at 24-25). Like Rivera, Simon traveled to Washington, attended President Trump's rally, and thereafter marched to the Capitol (*id.*). On the Lower Terrace, Simon "briefly joined other rioters in pushing a bicycle rack into a line of officers," entered the Capitol through the Senate Wing Door, and then made his way to the Crypt (*id.*). Unlike Rivera, however, Simon pleaded guilty to one count of Disorderly Conduct in a Restricted Building, which resulted in an eight-to-twelve months Guidelines range (*id.*). *See* 18 U.S.C. § 1752(a)(2). Chief Judge Beryl Howell sentenced Simon to eight months' imprisonment (ECF #69 at 25).

In his memorandum, Rivera asked the court to sentence him to probation (ECF #72). Rivera maintained that he "arrived at the Capitol grounds well after a large crowd had gathered" and he simply "video[ed] the event" (*id.* at 2). Rivera asserted that he did not "personally caus[e] any disturbance or damage to public property," enter any "closed chambers or offices," or "take anything from the Capitol premises" (*id.* at 2-3).

At his sentencing, Rivera personally addressed the court. He maintained that, although he understood he "messed up," his "only intent was to capture what was going on at the Capitol that day" (11/3/22:19). Rivera apologized to the "men who were there to defend the Capitol that day," but reiterated that it was not his "intent at all to be ill [sic] in any manner" (*id.* at 19-20).

Following the parties' arguments and Rivera's allocution, Judge Kollar-Kotelly – who had given "a great deal of thought" to Rivera's sentence (11/3/22:38) – reviewed the pertinent sentencing factors, including Rivera's "history and characteristics" (*id.* at 22-24), and the "nature and circumstances" of his offenses (*id.* at 24-35). *See* 18 U.S.C. § 3553(a)(1). As to the latter, the court emphasized that Rivera's offenses

were "serious" (11/3/22:37). Though Rivera "did not personally assault law enforcement officers," his "presence and exhortations to the mob helped create a momentum of violence" (*id.*). Rivera "was a rioter and insurrectionist; not just an observer but a participant and, in his own words, calling for a revolution" (*id.* at 35).

The court also considered Rivera's "remorse and his acceptance of responsibility" (11/3/22:36-37). *See* 18 U.S.C. § 3553(a)(1). "[A]lthough [Rivera] ha[d] made a statement of remorse" in his allocution, it was "totally inconsistent" with the "reprehensible views" he had previously shared on his Instagram account, which made "light of the injuries and trauma that law enforcement [officers] sustained" on January 6 (11/3/22:36-37).

Further, Rivera's lack of remorse "raise[d] concern on the court's part" as to whether he would "return to engaging in this type of criminal behavior in the future" (11/3/22:37). *See* 18 U.S.C. § 3553(a)(2)(B). Judge Kollar-Kotelly reminded Rivera "what an extraordinary country you live in with a vibrant democracy," and indicated her "hope" that her sentence would send a "message," deterring "you and others from ever engaging in this type of disruptive behavior in the future, recognizing you live in a

12

country with incomparable freedoms which are protected by the rule of law" (11/3/22:42-43).

As for the "need to avoid unwarranted sentencing disparities," 18 U.S.C. § 3553(a)(6), Judge Kollar-Kotelly "ha[d] looked carefully at the comparable conduct" of other January 6 rioters (11/3/22:43). Based on this review, she concluded Rivera's eight-month sentence was "appropriate," specifically deeming it a "just punishment" and one that would "serve to deter [Rivera] and others from engaging in . . . this criminal conduct ever again" (*id.* at 43-44).

## SUMMARY OF ARGUMENT

Contrary to Rivera's claim, the government's evidence showed he engaged in disruptive conduct by interrupting Congress's certification of the Electoral College votes. If nothing else, Rivera's unauthorized presence in the Capitol – along with the hundreds of other rioters – delayed Vice-President Pence's return to the certification process while the Secret Service cleared the Capitol of all such persons and then swept it for weapons. By circumventing the magnetometer and entering the Capitol through a broken window, Rivera thus undoubtedly disrupted the normal course of the certification process.

13

Additionally, Rivera's within-Guidelines sentence is procedurally correct and substantively reasonable. Rivera has pointed to nothing suggesting the district court sentenced him to eight months as punishment for exercising his trial right. To the contrary, the record demonstrates the district court sentenced Rivera to eight months because of the seriousness of his offenses, his lack of remorse, and to deter any such future criminal conduct.

## ARGUMENT

## I.    Sufficient Evidence Supported Rivera's Disorderly Conduct and Parading Convictions.

Rivera challenges (at 7-11) his disorderly conduct and parading convictions, mistakenly contending that a "person who is merely present and walks through the Capitol without loud yelling or disrupting" cannot be "convicted" of those offenses (capitalization omitted).[11]

---

[11] Though at times Rivera phrases this challenge as a sufficiency-of-the-evidence claim, at other times he characterizes it as a sentencing claim, asserting (at 10) it was "not fair to base [his] sentence on something he absolutely did not do." Moreover, the only relief he seeks (at 11) is that his "sentence should be vacated, or he should at minimum be resentenced in accordance with the circumstances of his case." In any event, whether

(continued . . . )

14

## A.  Applicable Legal Principles and Standard of Review

At the conclusion of Rivera's bench trial, the district court convicted him of, inter alia, Counts Two and Three, which required proof of disorderly or disruptive conduct with the intent to impede or disrupt government business (18 U.S.C. § 1752(a)(2)) or an orderly session of Congress (40 U.S.C. § 5104(e)(2)(D)). In addition, the § 1752(a)(2) charge required that the conduct "in fact" impede or disrupt "the orderly conduct of Government business or official functions." Further, pursuant to the parties' "[j]oint" proposed jury instructions, Rivera agreed that disorderly conduct occurs when, among other things, a person "interferes with another person by jostling against or unnecessarily crowding that person" (ECF #48 at 2). Disruptive conduct, Rivera further agreed, is "a disturbance that interrupts an event, activity, or the normal course of a process" (*id.* at 3).

The district court also convicted Rivera of Count Four, which required proof that he willfully and knowingly paraded, demonstrated,

---

perceived as a sufficiency challenge or a sentencing claim, Rivera's argument is meritless.

15

or picketed in a Capitol building. *See* 40 U.S.C. § 5104(e)(2)(G). As Rivera agreed, "parade" and "picket" have "their ordinary meanings," while "demonstrate" means "conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings, but does not include activities such as quiet praying" (ECF #48 at 4).[12]

This Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022). When assessing it, this Court "ask[s] 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Further, this Court "draw[s] no distinctions between direct and circumstantial evidence," and gives "'full play to the right of the [factfinder] to determine

---

[12] Below, Rivera did not move for judgment of acquittal on Count One, which charged him with entering or remaining in a restricted building (see 6/14/22:170-73, 177-78 ("for those three counts [Counts 2, 3, and 4], he should not be found guilty"). *See* 18 U.S.C. § 1752(a)(1). On appeal, Rivera likewise does not challenge this count of conviction.

credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999) (citation and quotation marks omitted).

### B. Rivera Engaged in Disorderly or Disruptive Conduct with the Intent To Impede the Electoral College Certification.

The government's evidence demonstrated that Rivera engaged in, at a minimum, disruptive conduct by "interrupt[ing] an event, activity, or the normal course of a process" (ECF #48 at 3). Secret Service Agent Lanelle Hawa agreed that the mob's multiple breaches of the Capitol "disrupt[ed]" the House and Senate sessions on January 6 (6/14/22:44), and Rivera was certainly part of this disruptive mob. Rivera, for example, was on the Capitol's Upper Terrace at 2:23 p.m., *i.e.*, just minutes before: (i) the Secret Service had to evacuate Vice-President Pence at 2:25 p.m. because of the fast encroaching "large group"; and (ii) the House had to recess at 2:29 p.m. because of the "breaches of individuals into the Capitol" (*id.* at 40, 44).

Moreover, after Vice-President Pence was evacuated, he could not return to the House or Senate side until *all* unauthorized persons –

including Rivera – had been expelled. The entire Capitol had to be cleared because the Secret Service "didn't know who the individuals were" and thus didn't know "if they were armed or they ha[d] anything dangerous on their person" (6/14/22:45). Additionally, the mob's invasion of the Capitol necessitated a security sweep once the unauthorized persons had been driven out. Law-enforcement personnel had to ensure that the unauthorized persons who had entered the Capitol – including Rivera – did not leave "dangerous materials or objects or anything . . . along [the Vice-President's] path[] or in the areas where [he] would be" (*id.*). Thus, although it may be true, as Rivera claims (at 9), that he was "only" inside the Capitol for twenty minutes, went "straight to the Crypt," and simply "admired" its "columns and statutes," his unauthorized breach and circumvention of the magnetometer and x-ray machine constituted disruptive conduct because it interrupted the normal course of the Electoral College certification by, among other things, delaying the Vice-President's return. *See Rivera*, 607 F. Supp. 3d at 9 ("[E]ven the presence of *one* unauthorized person in the Capitol is reason to suspend Congressional proceedings."); *id.* ("Many rioters collectively disrupted

Congressional proceedings, and each individual rioter contributed to that disruption.").

Alternatively, as the district court reasonably concluded, Rivera's "continued presence in a mob that is being tear gassed and pepper sprayed" was "disorderly insofar as [his] continued presence clearly impede[d] law enforcement's efforts to regain control of a particular area." *Rivera*, 607 F. Supp. 3d at 8. Rivera's own video documents that, when the Capitol Police officers tried to repel the mob advancing on the Upper Terrace with chemical sprays, Rivera did not retreat from the Capitol grounds. To the contrary, after adjusting his face coverings in order to protect himself from the gas, Rivera followed the mob to the Upper Terrace soon after the rioters had overrun the police line. Similarly, Rivera entered the Capitol just ten minutes after the mob breached the Senate Wing door a second time.[13] As one of the hundreds of rioters swarming the Upper Terrace and, ultimately, the Capitol, Rivera thus undoubtedly engaged in disorderly conduct by "interfer[ing]

---

[13] The mob initially breached the Senate Wing door at 2:13 p.m., but law enforcement regained control of that entry until the mob breached it a second time, at 2:49 p.m. (6/14/22:137; Exh. 337).

with another person" – *i.e.*, the officers protecting the Capitol, the Members, and the Vice-President – by "unnecessarily crowding that person" (ECF #48, at 2).

Further, Rivera's own words belie his claim (at 10) that he did not intend "'to impede or disrupt the orderly conduct of Government business.'" Well before January 6, Rivera announced his intent to travel to D.C. on that date and exhorted his followers to "Patriot the Fuck up America" (Exh. 406). Once in D.C., Rivera first attended the "Stop the Steal" rally, where then-President Trump urged the crowd to march to the Capitol and "'demand that Congress do the right thing and only count the electors who have been lawfully slated.'" *Thompson*, 20 F.4th at 18. Adhering to these commands, Rivera thereafter walked to the Capitol and, en route, declared he was going to "take [his] ass to the middle" of that building (Exh. 305). Before doing just that by climbing through a broken window, Rivera paused on the Upper Terrace and, amid the rioting throng, proclaimed, "[t]his is what they needed" (6/14/22:140; Exh. 317). Indeed, Rivera added, the "only way" there could be a "real revolution is if we go in and pull their asses out of there" (6/14/22:140; Exh. 317). Rivera thus plainly intended to disrupt or impede the Electoral

College certification by entering the Capitol along with the rioting mob and "pull[ing]" Members "out of there."[14]

## II.    The District Court's Within-Guidelines Sentence Is Procedurally Correct and Substantively Reasonable.

Rivera additionally alleges (at 3-7) that his eight-month sentence – which, he asserts, is "the longest misdemeanor sentence among all of the other misdemeanor sentences given from the January 6th cases" – is "unconstitutional because it was punishment for him exercising his right to go to trial." This claim is also meritless.

### A.    Applicable Legal Principles and Standard of Review

Under *Gall v. United States*, 552 U.S. 38 (2007), this Court reviews "sentences in a two-step process." *United States v. Miller*, 890 F.3d 317, 324 (D.C. Cir. 2018). First, this Court must "ensure that the district court

---

[14] Rivera similarly claims (at 10-11) that he was in "no way 'picketing, demonstrating or parading' in any of the Capitol Buildings." As the parties' jointly agreed-to instructions explain, however, "'demonstrate' refers to conduct that would disrupt the orderly business of Congress by, for example, impeding or obstructing passageways, hearings, or meetings" (ECF #48 at 4). And, as detailed at pp. 17-20 *supra*, the evidence certainly showed that Rivera's conduct disrupted Congress's orderly business by impeding the Electoral College certification.

committed no significant procedural error such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence[.]" *Gall*, 552 U.S. at 51. "Next, if the district court decision is procedurally sound," this Court reviews it for substantive reasonableness, "'tak[ing] into account the totality of the circumstances[.]'" *Miller*, 890 F.3d at 324 (quoting *Gall*, 552 U.S. at 51). The substantive reasonableness of a sentence is reviewed for abuse of discretion, *Gall*, 552 U.S. at 51, and this Court applies a presumption of reasonableness to a within-Guidelines sentence, *United States v. Parks*, 995 F.3d 241, 248 (D.C. Cir. 2021).

> **B.    In Carefully Applying the § 3353(a) Factors, Considering the Parties' Arguments, and Assiduously Explaining Its Reasoning, the District Court Arrived at a Procedurally Sound and Substantively Reasonable Eight-Month Sentence.**

Rivera levies several unsupported attacks against his sentence (at 5-7), contending it was: "punish[ment] for exercising his constitutional right to go to trial"; "so egregious that it shocked both the Probation Office

and defense attorneys"; and "the longest sentence out of all other misdemeanor sentences given from the January 6th cases." None of these charges is accurate, however, and this Court should affirm his within-Guidelines sentence.

In sentencing Rivera to eight months' imprisonment, the district court chose the lower end of the applicable six-to-twelve months Guidelines range. In doing so, the court carefully considered the "provisions of 18 U.S.C. [§] 3553" (11/3/22:44). In particular, the court appropriately emphasized the "serious" nature of Rivera's offenses: "[h]e did not personally assault law enforcement officers, but his presence and his exhortations to the mob helped create a momentum of violence" and his actions "provided safety for those violent actors" (*id*. at 37). *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). Judge Kollar-Kotelly also highlighted the potential deterrent effect of her eight-month sentence, declaring she hoped it would specifically deter Rivera from future crimes and would generally "deter others from ever participating in an insurrection against our constitutional order again" (11/3/22:38). *See* 18 U.S.C. § 3553(a)(2)(B). Further, though Rivera advocated for a probationary sentence, the court lawfully declined to accord him such leniency based

on, among other things, his lack of remorse, noting that, even after he had had "time to consider" his actions, he espoused "reprehensible views" about the Capitol Police officers, "making light of the[ir] injuries and trauma" (11/3/22:36-37). *See United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc) ("The whole notion of showing leniency to some deserving defendants – that is, of treating them more mildly than others – requires withholding leniency from others who appear less deserving."). Finally, the judge correctly considered the possibility of unwarranted disparities, noting she had "looked carefully" at the "comparable conduct" of other January 6th defendants and considered Rivera's eight-month sentence "appropriate" (11/3/22:43). In light of the court's careful consideration of the § 3553 sentencing factors, the parties' "arguments," the "trial record," and the "record generally" (*id.* at 21), the court's within-Guidelines sentence must be deemed procedurally correct and substantively reasonable.

Though Rivera claims (at 5) his sentence was "punishment" for "exercising his right to go to trial," it "is clear from the record of the sentencing hearing that the district court did not 'enhance' [Rivera's] sentence as 'punishment' for his exercise of constitutional rights," *United*

*States v. Bell*, 905 F.2d 458, 462 (D.C. Cir. 1990). As explained, the court properly sentenced Rivera to eight months' imprisonment for a variety of reasons – *e.g.*, the serious nature of his offenses, his lack of remorse, and the need for deterrence. Not only is there no support for Rivera's speculation about an improper motive, the record reflects the court's express recognition of Rivera's rights to "a trial" and not "to testify" (11/3/22:36). In short, though there "can be no doubt that the constitution continues to operate, even after a valid conviction, in the sentencing process," *United States v. Lemon*, 723 F.2d 922, 937 (D.C. Cir. 1983), Rivera has pointed to nothing supporting his claim (at 1) that the court sentenced him "to eight months in prison for choosing to exercise his Sixth Amendment right to go to trial." *See United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) (rejecting defendant's claim that his sentence "severely punish[ed] him for his decision to go to trial rather than accept a plea bargain"); *Bell*, 905 F.2d at 461-62 (rejecting defendant's claim that, "by giving consideration to his refusal to

cooperate," district court "effectively punished him for asserting" his rights to a jury trial and to remain silent).[15]

Rivera's disparity argument also fails. Though he claims (at 6) he was given the "longest misdemeanor sentence out of two hundred (200) sentences given," he has not proffered any statistics to support his claim, nor has he provided any comparison with defendants convicted of his specific offenses. In the district court, by contrast, the government submitted a lengthy chart that included similarly situated defendants who received six- and eight-month sentences (ECF #73-1 at 8, 28, 29). Indeed, in one of those cases, Chief Judge Howell sentenced the defendant to eight months' imprisonment even though he had pleaded

---

[15] This case is nothing like Rivera's primary authority (at 3-5). In *Thorne v. United States*, 46 A.3d 1085 (D.C. 2012), after defense counsel in a heroin-possession bench trial had declined to stipulate to the admissibility of the DEA-7 chemist's report and insisted on cross-examining the chemist, in sentencing the defendant to the maximum 180 days the court indicated it had taken "'into account'" the way the case had been "'tried'" and declared that counsel had "'to live with the consequences of your strategic decision.'" *Id.* at 1087-88. Based on the judge's sentencing comments, *Thorne* held there was a "'reasonable likelihood that [the judge] punished appellant for invoking his Sixth Amendment right of confrontation'" and remanded the case for resentencing. *Id.* at 1086. Here, in contrast, the record denotes no unconstitutional motive for the court's within-Guidelines sentence.

guilty (*id.* at 28; *see* ECF #69 at 24-25). Rivera does not acknowledge this evidence or explain why the district court was required to elevate the need to avoid unwarranted sentencing disparities above the other § 3553(a) factors the court considered, including the serious nature of Rivera's offenses and the need for specific and general deterrence.

Finally, there is nothing "shock[ing]" about Rivera's aggregate eight-month sentence.[16] The district court could have imposed a 12-month sentence for the § 1752 offenses. Eight months is within the Guidelines range of 6 to 12 months and Rivera's sentence is thus presumptively reasonable. *See Parks*, 995 F.3d at 248. Rivera does not overcome that presumption. To the contrary, it was entirely reasonable for the district court to conclude that the Guidelines range appropriately reflected the seriousness of Rivera's offenses. Rivera enthusiastically joined the violent mob entering the Capitol, encouraged other rioters,

---

[16] The district court sentenced Rivera to eight months' imprisonment on each of the two § 1752(a) counts and six months' imprisonment on each of the two § 5104 counts, all sentences to run concurrently (ECF #82 at 3). These sentences do not exceed the statutory maximums applicable to Rivera's offenses. *See* 18 U.S.C. § 1752(b)(2) (one year maximum for a violation of § 1752(a)(1) or (2)); 40 U.S.C. § 5109(b)(2) (six month maximum for a violation of 40 U.S.C. § 5104(e)(2)(D) or (G)).

urged his viewers to share his livestream, and exulted afterward that he had "had a great time" (6/14/22:154-55; Exh. 400). Rivera was "not just an observer but a participant and, in his own, words, calling for a revolution" (11/3/22:35). Further, his day-of-sentencing "remorse" was "totally inconsistent" with his post-crime mockery of the law-enforcement victims (*id.* at 36-37).[17]

---

[17] Though Rivera asserts (at 6) the court's sentence "shocked" the Probation Office, he provides no citation for this and the record reflects no such "shock[ ]" (see 11/3/22:2-51).

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the district court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
NICHOLAS P. COLEMAN
BARRY KENT DISNEY
Assistant United States Attorneys

/s/
_____
DAVID B. GOODHAND
D.C. Bar #438844
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
david.goodhand2@usdoj.gov
(202) 252-6829

29

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 5,506 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

_____/s/_____
DAVID B. GOODHAND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, John M. Pierce, Esq., jpierce@Johnpiercelaw.com, on this 19th day of April, 2023.

_____/s/_____
DAVID B. GOODHAND
Assistant United States Attorney

# ADDENDUM

# ADDENDUM

## INDEX

18 U.S.C.A. §1752.................................................................A-1

40 U.S.C.A. §5104.................................................................A-3

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 84. Presidential and Presidential Staff Assassination, Kidnapping and Assault

18 U.S.C.A. § 1752

§ 1752. Restricted building or grounds

Effective: October 5, 2018

Currentness

**(a)** Whoever--

**(1)** knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

**(2)** knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

**(3)** knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or [1]

**(4)** knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; [2]

**(5)** knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

**(b)** The punishment for a violation of subsection (a) is--

**(1)** a fine under this title or imprisonment for not more than 10 years, or both, if--

**(A)** the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

**(B)** the offense results in significant bodily injury as defined by section 2118(e)(3); and

**(2)** a fine under this title or imprisonment for not more than one year, or both, in any other case.

A-1

USCA Case #22-3088      Document #1995488      Filed: 04/19/2023      Page 41 of 45

**(c)** In this section--

    **(1)** the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--

        **(A)** of the White House or its grounds, or the Vice President's official residence or its grounds;

        **(B)** of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

        **(C)** of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

    **(2)** the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

### CREDIT(S)

    (Added Pub.L. 91-644, Title V, § 18, Jan. 2, 1971, 84 Stat. 1891; amended Pub.L. 97-308, § 1, Oct. 14, 1982, 96 Stat. 1451; Pub.L. 98-587, § 3(b), Oct. 30, 1984, 98 Stat. 3112; Pub.L. 103-322, Title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 109-177, Title VI, § 602(a), (b)(1), Mar. 9, 2006, 120 Stat. 252; Pub.L. 112-98, § 2, Mar. 8, 2012, 126 Stat. 263; Pub.L. 115-254, Div. B, Title III, § 381, Oct. 5, 2018, 132 Stat. 3320.)

Notes of Decisions (17)

### Footnotes

1      So in original. The word "or" probably should not appear.

2      So in original. Probably should be followed by "or".

18 U.S.C.A. § 1752, 18 USCA § 1752
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-2**

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
   Title 40. Public Buildings, Property, and Works (Refs & Annos)
      Subtitle II. Public Buildings and Works
         Part B. United States Capitol
            Chapter 51. United States Capitol Buildings and Grounds

40 U.S.C.A. § 5104

Formerly cited as 40 USCA § 193c; 40 USCA § 193d; 40 USCA § 193e; 40 USCA § 193f; 40 USCA § 193g; 40 USCA § 193m

§ 5104. Unlawful activities

Currency

**(a) Definitions.**--In this section--

  **(1) Act of physical violence.**--The term "act of physical violence" means any act involving--

    **(A)** an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

    **(B)** damage to, or destruction of, real or personal property.

  **(2) Dangerous weapon.**--The term "dangerous weapon" includes--

    **(A)** all articles enumerated in section 14(a) of the Act of July 8, 1932 ( ch. 465, 47 Stat. 654); and

    **(B)** a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

  **(3) Explosives.**--The term "explosives" has the meaning given that term in section 841(d) of title 18.

  **(4) Firearm.**--The term "firearm" has the meaning given that term in section 921(3) [1] of title 18.

**(b) Obstruction of roads.**--A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

A-3

**(c) Sale of articles, display of signs, and solicitations.**--A person may not carry out any of the following activities in the Grounds:

   **(1)** offer or expose any article for sale.

   **(2)** display a sign, placard, or other form of advertisement.

   **(3)** solicit fares, alms, subscriptions, or contributions.

**(d) Injuries to property.**--A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

**(e) Capitol Grounds and Buildings security.**--

   **(1) Firearms, dangerous weapons, explosives, or incendiary devices.**--An individual or group of individuals--

     **(A)** except as authorized by regulations prescribed by the Capitol Police Board--

       **(i)** may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

       **(ii)** may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

       **(iii)** may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

     **(B)** may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

   **(2) Violent entry and disorderly conduct.**--An individual or group of individuals may not willfully and knowingly--

     **(A)** enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

     **(B)** enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

A-4

**(C)** with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of--

**(i)** either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

**(ii)** the Library of Congress;

**(D)** utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

**(E)** obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;

**(F)** engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or

**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.

**(3) Exemption of government officials.**--This subsection does not prohibit any act performed in the lawful discharge of official duties by--

**(A)** a Member of Congress;

**(B)** an employee of a Member of Congress;

**(C)** an officer or employee of Congress or a committee of Congress; or

**(D)** an officer or employee of either House of Congress or a committee of that House.

**(f) Parades, assemblages, and display of flags.**--Except as provided in section 5106 of this title, a person may not--

**(1)** parade, stand, or move in processions or assemblages in the Grounds; or

**(2)** display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

**CREDIT(S)**

**A-5**

(Pub.L. 107-217, § 1, Aug. 21, 2002, 116 Stat. 1176; Pub.L. 110-161, Div. H, Title I, § 1004(d)(2)(A)(iii), Dec. 26, 2007, 121 Stat. 2234; Pub.L. 110-178, § 4(b)(1)(C), Jan. 7, 2008, 121 Stat. 2552; Pub.L. 111-145, § 6(d)(1), Mar. 4, 2010, 124 Stat. 54.)

### VALIDITY

<For constitutionality of certain provisions cited in the Revision Notes as a source for this section, see Jeannette Rankin Brigade v. Chief of Capitol Police, D.C.D.C.1972, 342 F.Supp. 575, affirmed 93 S.Ct. 311, 409 U.S. 972, 34 L.Ed.2d 236, for District Court decision holding former section 193g prohibiting parades or assemblages on the capitol grounds was void on its face on both First and Fifth Amendment grounds. >

Notes of Decisions (32)

### Footnotes

1        So in original. Probably should be "921(a)(3)".

40 U.S.C.A. § 5104, 40 USCA § 5104
Current through P.L. 117-327. Some statute sections may be more current, see credits for details.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**A-6**